**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FEENIX PAYMENT SYSTEMS, LLC, )
and FEENIX VENTURE PARTNERS, )
LLC, )     **Public Version**
 )
    Plaintiffs, )
 )
    v. )     No.  2020-1519-RGA
 )
STEEL CAPITAL MANAGEMENT, LLC, )     **JURY DEMANDED**
STEEL PAYMENTS, LLC, MICHAEL )
HOFFMAN, and MARC SEHGAL, )
 )
    Defendants. )

## COMPLAINT

Plaintiffs, Feenix Payment Systems, LLC ("FPS") and Feenix Venture Partners, LLC, ("FVP" and together with FPS, "Feenix"), bring this action against Defendants, Steel Capital Management, LLC ("SCM"), Steel Payments, LLC ("SP"), Michael Hoffman, and Marc Sehgal (with Hoffman, the "Individual Defendants").

## INTRODUCTION

1.    This action arises out of Defendants' misappropriation and improper disclosure of Feenix's trade secrets and confidential information concerning its investment strategy of ███ ████████████████████████████████████████████████ The Individual Defendants learned these trade secrets during their tenures at Feenix and, in contravention of their contractual obligations and fiduciary duty and duty of loyalty to Feenix, launched a derivative, competing investment firm that has both utilized and publicly disclosed these trade secrets.

2.    After leaving H/2 Capital Partners, a multi-billion dollar commercial real estate investment firm, in July 2017, Feenix founder Keith Lee started FPS, a vendor of payment-processing services. He did so after discovering that many companies in the hospitality, retail and

food & beverage industry were paying high fees for processing services that could be provided at a lower cost.

3.      After further concluding that he would be unable to convince companies to switch to FPS once incumbent payment processors matched its lower fees, Lee drew from his investment and structured finance experience to create a market offering that ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████  ███████████████████████████ allowed Feenix to provide a unique offering for, and means of attracting, portfolio companies in the competitive payment-processing and growth-capital lending market.

4.      In addition to ████████████████████████████████ Feenix's investors benefited from ███████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

5.      In early 2018, Lee brought Hoffman and Sehgal on as partners in FVP, with Hoffman to serve as general counsel and Sehgal to join Lee on the investments team. Shortly after joining, each of them memorialized the terms of the partnership in the Amended and Restated Limited Liability Company Agreement of FPS, dated February 26, 2018, which was later amended and restated as the Second Amended and Restated Limited Liability Company Agreement of FPS, dated October 31, 2018 (the "Operating Agreement") (Exhibit A hereto).

6.      In early 2020, Lee and Feenix decided it was best to part ways with Sehgal, and separation talks began in February 2020. Although he was FVP's general counsel, however, Hoffman refused to take a leading role in the negotiation of Sehgal's separation. Without the

company's own lawyer driving these negotiations, Sehgal's resulting separation agreement contained fewer burdensome terms binding him than would be expected given the situation. Lee and Feenix would come to conclude that Hoffman's refusal to take an active role in those negotiations was by design.

7.    Shortly after Sehgal's departure, Hoffman gave notice of his intent to leave and proposed a separation agreement whose terms were similar to Sehgal's separation agreement. Without understanding the nature of Sehgal's and Hoffman's parallel conduct, Feenix and Hoffman executed this separation agreement.

8.    Only two months after their departures from Feenix, Hoffman and Sehgal proceeded to form SCM and SP (together, "Steel Capital"), by leveraging Feenix's trade secrets. In doing so, Steel Capital has disclosed some of these trade secrets by openly advertising the business model and strategy that Feenix had originally pioneered and had not disclosed publicly.

9.    The Individual Defendants' use of these trade secrets violates their obligations of confidentiality and non-solicitation under the Operating Agreement and constitutes tortious misconduct. Feenix brings suit to stop Defendants' unlawful use of Feenix's trade secrets and to recover from them the harm that Feenix has suffered.

## PARTIES

### A.    Plaintiffs

10.    Feenix Payment Systems, LLC is organized under Delaware law and headquartered at 325 Hudson Street, 4th Floor, New York, New York. FPS is the ███████████ arm of Feenix.

11.    Feenix Venture Partners, LLC is organized under Delaware law and headquartered at 325 Hudson Street, 4th Floor, New York, New York. FVP is Feenix's ██████████ arm.

**B.**     **Defendants**

12.     Steel Capital Management, LLC is organized under Delaware laws and, upon information and belief, headquartered in New York, New York.

13.     Steel Payments, LLC is organized under Delaware law and, upon information and belief, headquartered in New York, New York.

14.     Michael Hoffman is Co-CEO and Co-Founder of Steel Capital, a former Partner, Investment Committee member, and General Counsel of FVP, and former member of FPS. He is a resident of New York.

15.     Marc Sehgal is Co-CEO and Co-Founder of Steel Capital, a former Partner and Investment Committee member of FVP, and former member of FPS. He is a resident of New York.

<u>JURISDICTION AND VENUE</u>

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq*. The Court has supplemental jurisdiction over Feenix's other claims pursuant to 28 U.S.C. § 1367.

17.     Venue lies within this District under 28 U.S.C. § 1391(b) because the Operating Agreement and separation agreements at issue each contain forum selection clauses providing that the parties consent to venue of the federal courts located in Delaware in connection with any action relating to the agreements.

<u>FACTUAL ALLEGATIONS</u>

**A.**     **The Founding of Feenix**

18.     Lee left his position as a Managing Director at H/2 Capital Partners, a multi-billion commercial real estate investment firm, in July 2017. In the course of working with operating

models in this industry, he noticed that credit card processing fees were higher than the lower rates advertised online, even for large organizations.

19.     Leveraging his connections in the hotel and hospitality space, Lee founded FPS and began offering those payment-processing services. He started pitching companies (including automobile dealerships, restaurants, and hotels) to convince them to switch their payment-processing services. These companies were (of course) interested in paying lower fees, but Lee further concluded that if large-scale payment processors ever faced real pricing pressure, they would be able to match the lower fees offered by FPS to retain customers. As a result, FPS would need to offer more than just lower fees to win business away in meaningful scale from incumbent processors.

20.     Drawing on both his experience investing in early-stage growth companies and his financing experience from his time as UBS Investment Bank's head of US Structured Financing, Lee concluded that the best way to incentivize these companies to switch to FPS for their payment-processing needs was to ███████████████████████████████████████████ ██████ What these companies needed most, like all growth-stage companies, was money.

21.     Feenix's investment model and strategy is unique primarily because of ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████

22.     This structure enabled significant benefits to each of Feenix, its investors, and the portfolio companies. ███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

23.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

24.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

25.     Feenix's strategy differentiates it from competitors in the space such as Merchant

Cash Advance (MCA) lenders, who advance cash to businesses based upon credit card sales, and

revenue-based lenders, who allow businesses to make fluctuating loan repayments in accordance

with what their cash flow allows. In fact, Feenix has confidentially discussed this investment

structure with over 300 potential portfolio companies and many were familiar with MCA revenue-based lenders, but none had ever encountered Feenix's strategy.

26.     Feenix took steps to ensure the details of this business strategy were kept confidential. The manner in which the payment-processing contracts are drafted to integrate with investment documents is closely guarded. Limited partners receive a presentation deck that is confidential and that goes into only partial detail of the investment model and strategy. Companies receive only a one-page description of Feenix that is barely more detailed than what is available on its websites but does highlight the benefits portfolio companies can expect to receive from the strategy. Information about Feenix's strategy is not otherwise disclosed.

**B.      Hoffman's and Sehgal's Tenure with Feenix**

27.     Hoffman and Sehgal joined Lee as partners in FVP in February 2018 and March 2018, respectively. Hoffman became general counsel of FVP, while Sehgal worked with Lee on investments. Both signed the Operating Agreement when they joined Feenix.

28.     In early 2020, Lee thought it was best for Feenix and Sehgal if they parted ways. In February 2020, negotiations for the separation began. During these negotiations, Lee was surprised by how passive Hoffman was in the process in spite of his position as Feenix's general counsel. Considering that Hoffman would not take an active role, Lee had to drive the negotiations with Sehgal. Sehgal told Lee during these negotiations that he would never compete with Feenix and that if he did, he would call Lee first. Lee believed him. The Sehgal Redemption Agreement was executed on March 11, 2020.

29.     Hoffman's refusal to take part in these negotiations was by design. While Lee and Feenix were negotiating the Sehgal Redemption Agreement, Hoffman and Sehgal were plotting to open up a competing enterprise that leveraged the unique investment model, strategy, and business offering, and implementation of them, that Lee and Feenix had conceived and pioneered.

7

30.     Hoffman proceeded to give notice of his intent to leave Feenix only two weeks after Sehgal's departure. The terms of the Sehgal Redemption Agreement, which resulted in significant part from Hoffman's non-participation in negotiating it, was used as a template to negotiate Hoffman's own redemption agreement on similar terms. The Hoffman Redemption Agreement was executed on March 27, 2020.

### C.     Hoffman and Sehgal Violate Their Contractual Obligations and Steel Capital Improperly Discloses Feenix's Confidential Information

31.     Only two months after leaving Feenix, Hoffman and Sehgal formed Steel Capital. Having seen the success and growth of Feenix, Hoffman and Sehgal launched SCM by copying Feenix's investment model and strategy of ████████████████████████████ and using business knowledge acquired while at Feenix, such as ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████

32.     Steel Capital also copied Feenix's two-entity structure, through SCM and SP. Whereas Feenix took steps to keep its unique offering protected, however, Steel Capital openly advertised and disclosed the strategy ██████████:



33. ██████████████ also discloses details of the strategy, including granular details

with respect to the aforementioned way Feenix passes down benefits to portfolio companies:



34.     This publication of Feenix's confidential integrated business model and strategy is and continues to be an improper disclosure of trade secrets. Indeed, ▮▮▮▮▮▮▮ reads like a distillation of the confidential presentations that Feenix provides to its limited partners and confidential pamphlet that Feenix provides to potential portfolio companies.



35.    Recalling the most common alternatives to Feenix's strategy from their conversations with potential portfolio companies while at Feenix, Defendants also highlight the

distinctions from MCA and revenue-based lenders on ▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮:



36.     Steel Capital has also contacted at least three of Feenix's current portfolio companies, with the apparent intent to offer its competing services.

37.     Section 15.5(a) of the Operating Agreement states:

> Each of the Holders and each Board Member (collectively, the "Restricted Parties") recognizes and acknowledges that such Restricted Party will be entrusted with or have access to confidential and proprietary information which is the property of the Companies and/or third parties to which the Companies owe a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise). Each Restricted Party therefore agrees that, at all times while such Restricted Party is a Holder or Manager, and for a period of eighteen (18) months thereafter, such Restricted Party shall (i) not, without the prior written consent of the Board of Managers, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Restricted Party's duties with respect to the Companies, (ii) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Companies (or, if applicable, of a third party to which the Companies owes a duty of confidentiality) in the Confidential Information and (iii) not, without the prior written consent of the Board of Managers, utilize or convert Confidential Information for such Restricted

> Party's own benefit or gain, of whatever nature other than in performance of such Restricted Party's duties with respect to the Companies. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Companies that is proprietary to the Companies (or relating to the business or affairs of a third party to which the Companies owes a duty of confidentiality) and which the Companies makes reasonable efforts to keep confidential.

(Ex. A at 37.) Section 15.5(c) of the Operating Agreement provides:

> During the period commencing on the date of this Agreement and ending on the eighteen (18) month period following the date that a Restricted Party is no longer a Holder, Member, or Manager, no Restricted Party shall, directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, employ **or engage**, or recruit or solicit for employment **or engagement**, any Person (i) who is employed or engaged by any of the Companies (both before and after the date hereof) or (ii) who was employed or engaged by any of the Companies within six months of such contact.

(*Id.*) (emphases added). In violation of the Operating Agreement, the Individual Defendants used Confidential Information to create their own competing fund and disclosed Confidential Information through Steel Capital's website. The Individual Defendants violated Section 15.5(e) of the Operating Agreement's non-solicitation and non-engagement provision in soliciting and engaging with each other to create this derivative venture. The provision's language regarding engagement specifically addresses situations where former partners mutually decide to work together without either former partner technically soliciting the other.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**The Defend Trade Secrets Act**
**(Against All Defendants)**

38.     Feenix incorporates the allegations above.

39.     Feenix is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Feenix's financial, business, scientific, technical, economic and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

40.     These trade secrets include, amongst other things, the investment strategy of ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████   ███████████████████████████   ██   ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████ Feenix has taken reasonable measures to keep such information secret.

41.     Feenix's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

42.     Defendants disclosed and/or used Feenix's trade secrets without Feenix's express or implied consent. Defendants have used improper means in using Feenix's trade secrets by failing to abide by the confidentiality provision of the Operating Agreement.

43.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through Feenix and that Defendants used improper means to acquire the trade secrets. Defendants acquired the trade secrets under

circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to Feenix to maintain the secrecy of its trade secrets or limit use thereof.

44.     Defendants' improper means in using and disclosing Feenix's trade secrets include Defendants' breach, or inducement of a breach, of a duty to maintain secrecy of the trade secrets and breach of the confidentiality provision of the Operating Agreement.

45.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in interstate or foreign commerce to the economic benefit of Feenix, and intended or knowing that the offense will injure Feenix, did the following:

> a.     stole, or without authorization, removed, concealed, or by fraud, artifice, or deception obtained such information;
>
> b.     without authorization copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information;
>
> c.     received or possessed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> d.     attempted to commit any offense described in paragraphs (a) through (c); or
>
> e.     conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

46.     Defendants continue to misappropriate Feenix's proprietary information through use of Feenix's unique investment model and strategy and disclosure of this model and strategy on

public websites. As a result of such misappropriation, Feenix has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (Against All Defendants)

47.    Feenix incorporates the allegations above.

48.    Feenix is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Feenix's financial, business, scientific, technical, economic and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

49.    These trade secrets include, amongst other things, the investment strategy of ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████  ██████████████████████████  ███  ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████  Feenix has taken reasonable measures to keep such information secret.

50.    Feenix's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Feenix derives an economic advantage of its competitors from its trade secrets.

51.     The Individual Defendants had access to and knowledge of Feenix's trade secrets during their tenures with Feenix.

52.     Defendants disclosed and/or used Feenix's trade secrets without Feenix's consent. Defendants have used improper means in using and disclosing Feenix's trade secrets by failing to abide by the confidentiality provision of the Operating Agreement and otherwise.

53.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through Feenix. Defendants acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to Feenix to maintain the secrecy of its trade secrets or limit use thereof.

54.     Defendants' improper means in using and disclosing Feenix's trade secrets include Defendants' breach, or inducement of a breach, of a duty to maintain secrecy of the trade secrets and breach of the confidentiality provision of the Operating Agreement.

55.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in interstate or foreign commerce to the economic benefit of Feenix, and intended or knowing that the offense will injure Feenix, did the following:

      a.     stole, or without authorization, removed, concealed, or by fraud, artifice, or deception obtained such information;

      b.     without authorization copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information;

      c.     received or possessed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

d.      attempted to commit any offense described in paragraphs (a) through (c); or

e.      conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

56.     Defendants continue to misappropriate Feenix's proprietary information through use of Feenix's unique investment model and strategy and disclosure of this model and strategy on public websites. As a result of such misappropriation, Feenix has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(Against the Individual Defendants)**

57.     Feenix incorporates the allegations above.

58.     The Individual Defendants are signatories to the Operating Agreement.

59.     The Operating Agreement constitutes a valid and enforceable written contract with definite and certain terms.

60.     FPS has performed and is still performing all of its required obligations under the Operating Agreement.

61.     The Individual Defendants have breached the confidentiality and non-solicitation provisions of the Operating Agreement.

62.     As a result of the violation of the confidentiality and non-solicitation provisions of the Operating Agreement, Feenix has suffered damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duty and Duty of Loyalty**
**(Against the Individual Defendants)**

63.     Feenix incorporates the allegations above.

64.     An employee is obligated to be loyal to his employer and a member of an LLC is obligated to be loyal to the LLC. Each are obligated to refrain from acting in any manner inconsistent with his agency or trust, and each is bound to exercise the utmost good faith and loyalty in the performance of his duties.

65.     As members and officers of FPS and FVP, the Individual Defendants occupied positions of trust and confidence with Feenix and owed Feenix a fiduciary duty and a duty of loyalty to act, at all times, in the best interests of Feenix.

66.     In violation of their fiduciary duty and duty of loyalty, the Individual Defendants misappropriated Feenix's confidential and proprietary information for their personal use and benefit and for the benefit of Steel Capital. Hoffman further negotiated Sehgal's Redemption Agreement with Sehgal's and his own interests in mind and at Feenix's expense.

67.     The Individual Defendants carried out all of these wrongful acts in secrecy and without the knowledge or consent of Feenix.

68.     Under New York law, which governs this aspect of Defendants' misconduct, because of their violations of their fiduciary duties to Feenix, each Individual Defendant forfeited all right to compensation paid by Feenix during their periods of disloyalty.

69.     As a result of the Individual Defendants' breach of fiduciary duty and duty of loyalty, Feenix has suffered and continues to suffer substantial damages, including, but not limited to, all amounts paid to each Individual Defendant by Feenix during their periods of disloyalty.

70.     The Individual Defendants acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above. As a result, Feenix is entitled to punitive damages.

### FIFTH CAUSE OF ACTION
**Unfair Competition**
**(Against All Defendants)**

71.     Feenix incorporates the allegations above.

72.     Defendants have misappropriated Feenix's labors and expenditures through their unlawful use of Feenix's trade secrets in Steel Capital's ███████████████ ████████ which is substantially the same as Feenix's.

73.     In misappropriating Feenix's labors and expenditures, Defendants acted in bad faith and exploited Feenix's exclusive commercial advantage.

74.     During their tenure as members and officers of Feenix, the Individual Defendants misappropriated Feenix's trade secrets and other confidential information in breach of their fiduciary duty and duty of loyalty to Feenix and of their contractual obligations.

75.     The Individual Defendants then used these trade secrets and confidential information to form and operate Steel Capital, exploiting the exclusive commercial advantage Feenix previously held through ████████████████████ ██████████.

76.     Defendants knew and know that ███████████████████████ █████████████████ it is using belonged to Feenix. Defendants knew that Feenix's strategy consisted of confidential trade secrets, and that the trade secrets were developed and owned by Feenix because the trade secrets were originally learned by the Individual Defendants during their tenure as members and officers of Feenix.

77.     As a direct and proximate consequence of the foregoing, Feenix has no adequate remedy at law, has been irreparably harmed and will continue to be irreparably harmed unless Defendants are enjoined from using and/or disclosing Plaintiff's trade secrets and other confidential information, and enjoined from engaging in the infringing conduct set forth above.

78.    In addition, Feenix is entitled to all damages that it has sustained by virtue of the above conduct, in an amount to be determined at trial, including, without limitation, Defendants' profits and gains arising from the wrongful acts described herein and Plaintiff's lost profits, attorneys' fees, costs and interest.

79.    The Defendants acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above. As a result, Feenix is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

i.    A judgment that Defendants misappropriated Feenix's trade secrets as alleged herein.

ii.    A judgment that the Individual Defendants breached the Operating Agreement as alleged herein.

iii.    A judgment that Defendants must cease operation of Steel Capital.

iv.    A judgment that each Individual Defendant must disgorge to Feenix all unjustly earned revenues and profits and other compensation paid to him after his first breach of his fiduciary duty and duty of loyalty.

v.    Damages, including treble damages, assessed against Defendants pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.*

vi.    Damages assessed against Defendants for misappropriating trade secrets and for unfair competition, including compensatory damages, unjust enrichment, or restitution damages and reasonable royalty damages.

vii.   Imposition of a constructive trust for the benefit of Feenix as a vehicle for disgorgement of all monies, profits and gains Defendants have obtained or will unjustly obtain in the future at the expense of Feenix.

viii.   A grant of a preliminary and permanent injunction to eliminate the unfair advantage Defendants gained by using Feenix's trade secrets and other intellectual property.

ix.   Punitive damages for Defendants' willful and wanton misappropriation and the tortious conduct described above.

x.   Exemplary damages pursuant to the Defend Trade Secrets Act for Defendants' willful and malicious conduct.

xi.   Expenses, costs, and attorneys' fees.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all claims.

Of Counsel:

Edward Normand
Kyle W. Roche
Warren Li
ROCHE CYRULNIK FREEDMAN LLP
99 Park Street, Suite 1910
New York, New York 10016
(646) 791-6881

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Hayley M. Lenahan (#6174)
MCCOLLOM D'EMILIO SMITH
  UEBLER LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960
tuebler@mdsulaw.com
jchristensen@mdsulaw.com
hlenahan@mdsulaw.com

*Attorneys for Plaintiffs*

November 11, 2020

Publicly Filed: November 18, 2020