## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FEENIX PAYMENT SYSTEMS, LLC,    )
and FEENIX VENTURE PARTNERS,    )
LLC,                            )
                                )
      Plaintiffs,               )
                                )
    v.                        )      No. 20-1519-MAK
                                )
STEEL CAPITAL MANAGEMENT, LLC,  )      **JURY DEMANDED**
STEEL PAYMENTS, LLC, MICHAEL    )
HOFFMAN, and MARC SEHGAL,       )
                                )
      Defendants.               )

## SECOND AMENDED COMPLAINT

Plaintiffs, Feenix Payment Systems, LLC ("FPS") and Feenix Venture Partners, LLC, ("FVP" and together with FPS, "Feenix"), bring this action against Defendants, Steel Capital Management, LLC ("SCM"), Steel Payments, LLC ("SP"), Michael Hoffman, and Marc Sehgal (with Hoffman, the "Individual Defendants").

## INTRODUCTION

1.    This action arises out of Defendants' misappropriation and improper disclosure of Feenix's trade secrets and confidential information concerning its investment strategy of coupling growth-capital investments and payment-processing services. The Individual Defendants learned these trade secrets during their tenures at Feenix and, in contravention of their contractual obligations to Feenix, launched a derivative, competing investment firm that has both utilized and publicly disclosed these trade secrets.

2.    After leaving H/2 Capital Partners, a multi-billion dollar commercial real estate investment firm, in July 2017, Feenix founder Keith Lee started FPS, a vendor of payment-processing services. He did so after discovering that many companies in the hospitality, retail and

food & beverage industry were paying high fees for processing services that could be provided at a lower cost.

3.      After further concluding that he would be unable to convince companies to switch to FPS once incumbent payment processors matched its lower fees, Lee drew from his investment and structured finance experience to create a market offering that (1) provided payment-processing fees, through FPS, and (2) provided the companies paying those fees with access to cash to finance their growth, through FVP. Combining the two components together allowed Feenix to provide a unique offering for, and means of attracting, portfolio companies in the competitive payment-processing and growth-capital lending market.

4.      In addition to aligning Feenix's incentives with the companies in which it invested, Feenix's investors benefited from a steady stream of income from payment-processing fees in conjunction with real-time transparency into these companies' sales. The payment-processing fees allowed FVP to offer more attractive terms on capital and the transparency also reduced the reporting burdens these companies owed to their investors.

5.      In early 2018, Lee brought Hoffman and Sehgal on as partners in FVP, with Hoffman to serve as general counsel and Sehgal to join Lee on the investments team. Shortly after joining, each of them memorialized the terms of the partnership in the Amended and Restated Limited Liability Company Agreement of FPS, dated February 26, 2018, which was later amended and restated as the Second Amended and Restated Limited Liability Company Agreement of FPS, dated October 31, 2018 (the "Operating Agreement") (Exhibit A hereto).

6.      In early 2020, Lee and Feenix decided it was best to part ways with Sehgal, and separation talks began in February 2020. Although he was FVP's general counsel, however, Hoffman refused to take a leading role in the negotiation of Sehgal's separation. Without the

company's own lawyer driving these negotiations, Sehgal's resulting separation agreement contained fewer burdensome terms binding him than would be expected given the situation. Lee and Feenix would come to conclude that Hoffman's refusal to take an active role in those negotiations was by design.

7.     Shortly after Sehgal's departure, Hoffman gave notice of his intent to leave and proposed a separation agreement whose terms were similar to Sehgal's separation agreement. Without understanding the nature of Sehgal's and Hoffman's parallel conduct, Feenix and Hoffman executed this separation agreement.

8.     Only two months after their departures from Feenix, Hoffman and Sehgal proceeded to form SCM and SP (together, "Steel Capital"), by leveraging Feenix's trade secrets. In doing so, Steel Capital has disclosed some of these trade secrets by openly advertising the business model and strategy that Feenix had originally pioneered and had not disclosed publicly.

9.     The Individual Defendants' use of these trade secrets violates their obligations of confidentiality and non-solicitation under the Operating Agreement and constitutes tortious misconduct. Feenix brings suit to stop Defendants' unlawful use of Feenix's trade secrets and to recover from them the harm that Feenix has suffered.

## PARTIES

### A.     Plaintiffs

10.     Feenix Payment Systems, LLC is organized under Delaware law and headquartered at 325 Hudson Street, 4th Floor, New York, New York. FPS is the credit-card processing arm of Feenix.

11.     Feenix Venture Partners, LLC is organized under Delaware law and headquartered at 325 Hudson Street, 4th Floor, New York, New York. FVP is Feenix's investment arm.

B.      **Defendants**

12.     Steel Capital Management, LLC is organized under Delaware laws and, upon information and belief, headquartered in New York, New York.

13.     Steel Payments, LLC is organized under Delaware law and, upon information and belief, headquartered in New York, New York.

14.     Michael Hoffman is Co-CEO and Co-Founder of Steel Capital, a former Partner, Investment Committee member, and General Counsel of FVP, and former member of FPS. He is a resident of New York.

15.     Marc Sehgal is Co-CEO and Co-Founder of Steel Capital, a former Partner and Investment Committee member of FVP, and former member of FPS. He is a resident of New York.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq*. The Court has supplemental jurisdiction over Feenix's other claims pursuant to 28 U.S.C. § 1367.

17.     Venue lies within this District under 28 U.S.C. § 1391(b) because the Operating Agreement and separation agreements at issue each contain forum selection clauses providing that the parties consent to venue of the federal courts located in Delaware in connection with any action relating to the agreements.

## FACTUAL ALLEGATIONS

A.      **The Founding of Feenix**

18.     Lee left his position as a Managing Director at H/2 Capital Partners, a multi-billion commercial real estate investment firm, in July 2017. In the course of working with operating

models in this industry, he noticed that credit card processing fees were higher than the lower rates advertised online, even for large organizations.

19.     Leveraging his connections in the hotel and hospitality space, Lee founded FPS and began offering those payment-processing services. He started pitching companies (including automobile dealerships, restaurants, and hotels) to convince them to switch their payment-processing services. These companies were (of course) interested in paying lower fees, but Lee further concluded that if large-scale payment processors ever faced real pricing pressure, they would be able to match the lower fees offered by FPS to retain customers. As a result, FPS would need to offer more than just lower fees to win business away in meaningful scale from incumbent processors.

20.     Drawing on both his experience investing in early-stage growth companies and his financing experience from his time as UBS Investment Bank's head of US Structured Financing, Lee concluded that the best way to incentivize these companies to switch to FPS for their payment-processing needs was to couple the service with equity, debt, and/or combination investment capital. What these companies needed most, like all growth-stage companies, was money.

21.     Feenix's investment model and strategy is unique primarily because of the manner in which it couples its venture initiatives with payment-processing services. Under and through this model, Feenix's interests are uniquely aligned with the incentives of its portfolio companies, because money earned through Feenix's payment-processing fees scales with its portfolio companies' growth. Lee founded FVP in December 2017 to make the cash investments, creating the current Feenix structure.

22.     This structure enabled significant benefits to each of Feenix, its investors, and the portfolio companies. The payment-processing operations provide real-time transparency to the

companies' sales, a useful risk-management tool that also alleviates portfolio companies' reporting burdens and limits their financial covenants. The fees that Feenix receives from these contracts create a steady stream of revenue for investors in Feenix's funds, in addition to equity-like upside if the portfolio company grows. Since Feenix tends to favor safer debt investments, that upside also often comes without the customary downsides of equity investment.

23.     This revenue stream puts less pressure on its portfolio companies to reach liquidation events. (A liquidation event is an event that causes a company either to be sold or to cease to exist as a standalone company. It results in investors being cashed out of some or all of their ownership shares. In many traditional venture capital arrangements, a liquidation event is the only way for an investor to receive a return on its investment.)  The two-entity structure allows for flexibility if a tax-sensitive limited partner cannot participate in the payment-processing income.

24.     Additional benefits of the strategy to Feenix's portfolio companies include competitive interest rates, alignment of interests in growing the business, no equity dilution, no prepayment penalties, flexible terms according to what the company needs, committed future funding upon reaching certain preset milestones, and monetizing an expense for which the company would otherwise receive little benefit. These benefits are available as a direct result of Feenix's investment structure and the way Feenix passes the advantages it receives down to its portfolio companies is a part of its confidential strategy.

25.     Feenix's strategy differentiates it from competitors in the space such as Merchant Cash Advance (MCA) lenders, who advance cash to businesses based upon credit card sales, and revenue-based lenders, who allow businesses to make fluctuating loan repayments in accordance with what their cash flow allows. In fact, Feenix has confidentially discussed this investment

structure with over 300 potential portfolio companies and many were familiar with MCA revenue-based lenders, but none had ever encountered Feenix's strategy.

26.     Feenix took steps to ensure the details of this business strategy were kept confidential. The manner in which the payment-processing contracts are drafted to integrate with investment documents is closely guarded. Limited partners receive a presentation deck that is confidential and that goes into only partial detail of the investment model and strategy. Companies receive only a one-page description of Feenix that is barely more detailed than what is available on its websites but does highlight the benefits portfolio companies can expect to receive from the strategy. Information about Feenix's strategy is not otherwise disclosed.

### B.     Hoffman's and Sehgal's Tenure with Feenix

27.     Hoffman and Sehgal joined Lee as partners in FVP in February 2018 and March 2018, respectively. Hoffman became general counsel of FVP, while Sehgal worked with Lee on investments. Both signed the Operating Agreement when they joined Feenix.

28.     In early 2020, Lee thought it was best for Feenix and Sehgal if they parted ways. In February 2020, negotiations for the separation began. During these negotiations, Lee was surprised by how passive Hoffman was in the process in spite of his position as Feenix's general counsel. Considering that Hoffman would not take an active role, Lee had to drive the negotiations with Sehgal. Sehgal told Lee during these negotiations that he would never compete with Feenix and that if he did, he would call Lee first. Lee believed him. The Sehgal Redemption Agreement was executed on March 11, 2020.

29.     Hoffman's refusal to take part in these negotiations was by design. While Lee and Feenix were negotiating the Sehgal Redemption Agreement, Hoffman and Sehgal were plotting to open up a competing enterprise that leveraged the unique investment model, strategy, and business offering, and implementation of them, that Lee and Feenix had conceived and pioneered.

30.     Hoffman proceeded to give notice of his intent to leave Feenix only two weeks after Sehgal's departure. The terms of the Sehgal Redemption Agreement, which resulted in significant part from Hoffman's non-participation in negotiating it, was used as a template to negotiate Hoffman's own redemption agreement on similar terms. The Hoffman Redemption Agreement was executed on March 27, 2020.

### C.     Hoffman and Sehgal Violate Their Contractual Obligations and Steel Capital Improperly Discloses Feenix's Confidential Information

31.     Only two months after leaving Feenix, Hoffman and Sehgal formed Steel Capital. Having seen the success and growth of Feenix, Hoffman and Sehgal launched SCM by copying Feenix's investment model and strategy of coupling payment processing with growth capital and using business knowledge acquired while at Feenix, such as how to structure contractual arrangements to implement the strategy, how to explain and sell the benefits of the strategy to limited partners, how to source and analyze portfolio company investment opportunities, how to price services based on experience with trends and portfolio-companies' preferences in this segment of the market, how to use the payment-processing data to judge performance and risk levels, and how to negotiate with portfolio companies to achieve maximum returns.

32.     Steel Capital also copied Feenix's two-entity structure, through SCM and SP. Whereas Feenix took steps to keep its unique offering protected, however, Steel Capital openly advertised and disclosed the strategy on its website:

## Unique Strategy

Our portfolio companies are able to realize tangible benefits:

- Lower cost financing terms
- Reducing the need for financial covenants through realtime transparency on sales volume
- Monetizing an expense for which you otherwise receive little benefit

**Through our dual role as both a lender and a payment processor, our unique strategy is the most effective way to offer non-dilutive capital on competitive terms.**

# We partner with emerging B2C companies by providing innovative capital solutions to accelerate growth

Steel provides lower-cost growth capital in the form of non-dilutive debt financing to select business-to-consumer companies in the omnichannel retail (E-commerce and/or physical locations) and food & beverage industries. Our flexible, creative and cutting-edge financing solutions are designed to solve for what matters most to your business - whether that is term, interest rate, upfront capital, milestone-based forward commitments or something else – so that you can focus on growth.

33.    The SCM website also discloses details of the strategy, including granular details with respect to the aforementioned way Feenix passes down benefits to portfolio companies:



**No Equity Dilution**

Retain full ownership and scale your company at your own pace, not at a time when your valuation is suboptimal.

**Alignment**

Our investment model fully aligns us with your growth.

**No Prepayment Penalty**

Our investment model allows portfolio companies to prepay a loan at any time with no fees.

**Flexibility**

Our investment strategy and visibility into top lines sales allows for flexible financing terms depending on what matters to you most (term, size, rate, forward commitment, processing fees).

**We Understand Entrepreneurs**

As fellow entrepreneurs, we know you are the person who understands how to best run your business. We give you the latitude to make the right decisions to grow your company.

**Forward Commitments**

As you execute on your growth plan and achieve predetermined milestones, have comfort that you can draw on more capital in the future without any negotiation.

– **As a lender, do you actually care about our success?**

**Yes, unlike most lenders, our returns are directly correlated to your company's growth.** This alignment underpins our strategy, fosters transparency and allows us to structure a loan with optimal value to you.

– **How can companies use the loan proceeds?**

**Our loans are used for growth but we do not restrict how that is achieved.** As opposed to an inventory-based loan that prescribes the use of funds and causes large seasonal cashflow swings, we know that you are best suited to determine whether funds can be most effectively used for working capital, marketing, strategic hires, acquisitions or inventory.

34.     This publication of Feenix's confidential integrated business model and strategy is and continues to be an improper disclosure of trade secrets. Indeed, SCM's website reads like a distillation of the confidential presentations that Feenix provides to its limited partners and confidential pamphlet that Feenix provides to potential portfolio companies.



## Fund Strategy

**Feenix Venture Partners Fund III, LP ("FVP III") seeks to create a return profile with:**

- Short duration capital at risk (24 months on average), and

- Long duration super priority fee income stream (up to 10 years) generated through credit card processing fees

**FVP III provides a distinct combination of payment processing services combined with debt:**

- "Win-win" for FVP III and borrower

- FVP III lends to nimble and growing consumer-facing businesses in the post-COVID recovery period in combination with credit card processing

- Payment processing ("CCP") provides real-time, full transparency on sales activity, which serves as a critical risk management tool

---

### Our Unique Approach To Investing

**Investment Strategy**

**Feenix Venture Partners, LLC ("FVP")** seeks to provide growth capital to its portfolio companies and serve as a finance partner to enhance their growth as their business evolves through its lifecycle. We have the flexibility to creatively structure solutions customized for a company's unique financial situation.

We provide:

- Preferred equity or convertible debt;
- General Partner (GP) and Limited Partner (LP) loans;
- Venture debt up to 5 years in term, competitive interest rates, limited covenants, no pre-payment penalties and typically no warrants; and
- Committed future funding with preset terms so our companies can focus on executing on their business plans rather than raising capital.

**Target Sectors**

- Direct-to-consumer focus and B2B models that accept credit cards:
  - Retailers (online and bricks and mortar)
  - Consumer services (most types)
  - Digital marketing for eCommerce and other SaaS companies
  - Food & Beverage (QSR, fast and premium casual and fine dining, food halls.)
  - Hospitality/ Lodging and Gaming
  - Office co-working and self-storage
  - Schools and Academies

---

35.     Recalling the most common alternatives to Feenix's strategy from their conversations with potential portfolio companies while at Feenix, Defendants also highlight the

distinctions   from   MCA   and   revenue-based   lenders   on   the   Steel   Capital   website:

– **Does Steel provide revenue-based financing?**

> **No, revenue-based loans have variable payments based on a share of revenues, penalizing companies for outperformance.** If you have taken the time to hone your marketing strategy and outperform your revenue forecast, then you should be rewarded with the extra cashflow. We think paying your lender back faster as you gain momentum is counterproductive for both of us.

– **Is Steel a Merchant Cash Advance provider?**

> **No, Steel's philosophy and products take the opposite approach.** A MCA is actually a sale of future revenues, where a company receives a cash advance for short-term needs and is automatically and rapidly repaid through an exorbitantly high percentage of daily sales, which naturally hamstrings the growth of the business. In our experience, the high effective interest rate and very short payback period does more harm than good to the company.

36.   Steel Capital has also contacted at least three of Feenix's current portfolio companies, with the apparent intent to offer its competing services.

37.   Section 15.5(a) of the Operating Agreement states:

> Each of the Holders and each Board Member (collectively, the "Restricted Parties") recognizes and acknowledges that such Restricted Party will be entrusted with or have access to confidential and proprietary information which is the property of the Companies and/or third parties to which the Companies owe a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise).  Each Restricted Party therefore agrees that, at all times while such Restricted Party is a Holder or Manager, and for a period of eighteen (18) months thereafter, such Restricted Party shall (i) not, without the prior written consent of the Board of Managers, directly or indirectly, use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance of such Restricted Party's duties with respect to the Companies, (ii) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Companies (or, if applicable, of a third party to which the Companies owes a duty of confidentiality) in the Confidential Information and (iii) not, without the prior written consent of the Board of Managers, utilize or convert Confidential Information for such Restricted

> Party's own benefit or gain, of whatever nature other than in performance of such Restricted Party's duties with respect to the Companies. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Companies that is proprietary to the Companies (or relating to the business or affairs of a third party to which the Companies owes a duty of confidentiality) and which the Companies makes reasonable efforts to keep confidential.

(Ex. A at 37.) Section 15.5(c) of the Operating Agreement provides:

> During the period commencing on the date of this Agreement and ending on the eighteen (18) month period following the date that a Restricted Party is no longer a Holder, Member, or Manager, no Restricted Party shall, directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, employ **or engage**, or recruit or solicit for employment **or engagement**, any Person (i) who is employed or engaged by any of the Companies (both before and after the date hereof) or (ii) who was employed or engaged by any of the Companies within six months of such contact.

(*Id.*) (emphases added). In violation of the Operating Agreement, the Individual Defendants used Confidential Information to create their own competing fund and disclosed Confidential Information through Steel Capital's website. The Individual Defendants violated Section 15.5(e) of the Operating Agreement's non-solicitation and non-engagement provision in soliciting and engaging with each other to create this derivative venture. The provision's language regarding engagement specifically addresses situations where former partners mutually decide to work together without either former partner technically soliciting the other.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### The Defend Trade Secrets Act
### (Against All Defendants)

38.     Feenix incorporates the allegations above.

39.     Feenix is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Feenix's financial, business, scientific, technical, economic and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

40.     These trade secrets include, amongst other things, the investment strategy of coupling growth capital investments and payment-processing services, the structuring of contractual arrangements to implement this strategy, materials used to explain and sell the benefits of this strategy to limited partners, sourcing and analysis of portfolio-company investment opportunities, pricing models based on experience with trends and portfolio-companies' preferences in this segment of the market, the use of the payment-processing data to judge performance and risk levels, and negotiation tactics with portfolio companies to achieve maximum returns. Feenix has taken reasonable measures to keep such information secret.

41.     Feenix's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

42.     Defendants disclosed and/or used Feenix's trade secrets without Feenix's express or implied consent. Defendants have used improper means in using Feenix's trade secrets by failing to abide by the confidentiality provision of the Operating Agreement.

43.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through Feenix and that Defendants used improper means to acquire the trade secrets. Defendants acquired the trade secrets under

circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to Feenix to maintain the secrecy of its trade secrets or limit use thereof.

44.     Defendants' improper means in using and disclosing Feenix's trade secrets include Defendants' breach, or inducement of a breach, of a duty to maintain secrecy of the trade secrets and breach of the confidentiality provision of the Operating Agreement.

45.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in interstate or foreign commerce to the economic benefit of Feenix, and intended or knowing that the offense will injure Feenix, did the following:

        a.      stole, or without authorization, removed, concealed, or by fraud, artifice, or deception obtained such information;

        b.      without authorization copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information;

        c.      received or possessed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

        d.      attempted to commit any offense described in paragraphs (a) through (c); or

        e.      conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

46.     Defendants continue to misappropriate Feenix's proprietary information through use of Feenix's unique investment model and strategy and disclosure of this model and strategy on

public websites. As a result of such misappropriation, Feenix has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (Against All Defendants)

47.     Feenix incorporates the allegations above.

48.     Feenix is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Feenix's financial, business, scientific, technical, economic and engineering information, including but not limited to, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

49.     These trade secrets include, amongst other things, the investment strategy of coupling growth capital investments and payment-processing services, the structuring of contractual arrangements to implement this strategy, materials used to explain and sell the benefits of this strategy to limited partners, sourcing and analysis of portfolio-company investment opportunities, pricing models based on experience with trends and portfolio-companies' preferences in this segment of the market, the use of the payment-processing data to judge performance and risk levels, and negotiation tactics with portfolio companies to achieve maximum returns. Feenix has taken reasonable measures to keep such information secret.

50.     Feenix's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Feenix derives an economic advantage of its competitors from its trade secrets.

51.     The Individual Defendants had access to and knowledge of Feenix's trade secrets during their tenures with Feenix.

52.     Defendants disclosed and/or used Feenix's trade secrets without Feenix's consent. Defendants have used improper means in using and disclosing Feenix's trade secrets by failing to abide by the confidentiality provision of the Operating Agreement and otherwise.

53.     Defendants knew or had reason to know at the time of disclosure or use that their knowledge of the trade secrets was derived from or through Feenix. Defendants acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets. Defendants owed a duty to Feenix to maintain the secrecy of its trade secrets or limit use thereof.

54.     Defendants' improper means in using and disclosing Feenix's trade secrets include Defendants' breach, or inducement of a breach, of a duty to maintain secrecy of the trade secrets and breach of the confidentiality provision of the Operating Agreement.

55.     Defendants, with intent to convert trade secrets that are related to a product or service used or intended for use in interstate or foreign commerce to the economic benefit of Feenix, and intended or knowing that the offense will injure Feenix, did the following:

  a.      stole, or without authorization, removed, concealed, or by fraud, artifice, or deception obtained such information;

  b.      without authorization copied, duplicated, sketched, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information;

  c.      received or possessed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

     d.      attempted to commit any offense described in paragraphs (a) through (c); or

     e.      conspired with one or more other persons to commit any offense described in paragraphs (a) through (c), and one or more of such persons performed an act to effect the object of the conspiracy.

56.     Defendants continue to misappropriate Feenix's proprietary information through use of Feenix's unique investment model and strategy and disclosure of this model and strategy on public websites. As a result of such misappropriation, Feenix has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(Against the Individual Defendants)**

57.     Feenix incorporates the allegations above.

58.     The Individual Defendants are signatories to the Operating Agreement.

59.     The Operating Agreement constitutes a valid and enforceable written contract with definite and certain terms.

60.     FPS has performed and is still performing all of its required obligations under the Operating Agreement.

61.     The Individual Defendants have breached the confidentiality and non-solicitation provisions of the Operating Agreement.

62.     As a result of the violation of the confidentiality and non-solicitation provisions of the Operating Agreement, Feenix has suffered damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Unfair Competition**
**(Against All Defendants)**

63.     Feenix incorporates the allegations above.

64.     Defendants have misappropriated Feenix's labors and expenditures through their unlawful use of Feenix's trade secrets in Steel Capital's investment and payment processing strategy, which is substantially the same as Feenix's.

65.     In misappropriating Feenix's labors and expenditures, Defendants acted in bad faith and exploited Feenix's exclusive commercial advantage.

66.     During their tenure as members and officers of Feenix, the Individual Defendants misappropriated Feenix's trade secrets and other confidential information in breach of their contractual obligations.

67.     The Individual Defendants then used these trade secrets and confidential information to form and operate Steel Capital, exploiting the exclusive commercial advantage Feenix previously held through their combination of growth capital investments and payment processing services.

68.     Defendants knew and know that the combination growth-capital investment and payment-processing-services strategy it is using belonged to Feenix. Defendants knew that Feenix's strategy consisted of confidential trade secrets, and that the trade secrets were developed and owned by Feenix because the trade secrets were originally learned by the Individual Defendants during their tenure as members and officers of Feenix.

69.     As a direct and proximate consequence of the foregoing, Feenix has no adequate remedy at law, has been irreparably harmed and will continue to be irreparably harmed unless Defendants are enjoined from using and/or disclosing Plaintiff's trade secrets and other confidential information, and enjoined from engaging in the infringing conduct set forth above.

70.     In addition, Feenix is entitled to all damages that it has sustained by virtue of the above conduct, in an amount to be determined at trial, including, without limitation, Defendants'

profits and gains arising from the wrongful acts described herein and Plaintiff's lost profits, attorneys' fees, costs and interest.

71.     The Defendants acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above. As a result, Feenix is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

    i. A judgment that Defendants misappropriated Feenix's trade secrets as alleged herein.

    ii. A judgment that the Individual Defendants breached the Operating Agreement as alleged herein.

    iii. A judgment that Defendants must cease operation of Steel Capital.

    iv. Damages, including treble damages, assessed against Defendants pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.*

    v. Damages assessed against Defendants for misappropriating trade secrets and for unfair competition, including compensatory damages, unjust enrichment, or restitution damages and reasonable royalty damages.

    vi. Imposition of a constructive trust for the benefit of Feenix as a vehicle for disgorgement of all monies, profits and gains Defendants have obtained or will unjustly obtain in the future at the expense of Feenix.

    vii. A grant of a preliminary and permanent injunction to eliminate the unfair advantage Defendants gained by using Feenix's trade secrets and other intellectual property.

viii.   Punitive damages for Defendants' willful and wanton misappropriation

and the tortious conduct described above.

ix.   Exemplary damages pursuant to the Defend Trade Secrets Act for

Defendants' willful and malicious conduct.

x.   Expenses, costs, and attorneys' fees.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims.


Of Counsel:

Edward Normand
Kyle W. Roche
Warren Li
ROCHE CYRULNIK FREEDMAN LLP
99 Park Street, Suite 1910
New York, New York 10016
(646) 791-6881

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
Joseph L. Christensen (#5146)
Hayley M. Lenahan (#6174)
MCCOLLOM D'EMILIO SMITH
  UEBLER LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808
(302) 468-5960
tuebler@mdsulaw.com
jchristensen@mdsulaw.com
hlenahan@mdsulaw.com

*Attorneys for Plaintiffs*

June 28, 2021